IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAKESIA TRENT, | : | CIVIL ACTION |
|  | : | NO. 10-1290 |
| v. | : |  |
|  | : |  |
| TEST AMERICA, INC., et al. | : |  |

O'NEILL, J.                                                                                                          April 30, 2013

## MEMORANDUM

Plaintiff, Lakesia Trent, who is African-American, asserts against defendant Test America, Inc.[1] claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and claims of race discrimination pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, et seq. As against defendant Aerotek Scientific, LLC, plaintiff asserts claims of race discrimination pursuant to Section 1981 and the PHRA.[2] I have before me motions for summary judgment by TestAmerica (Dkt. No. 47) and Aerotek (Dkt. No. 48), plaintiff's omnibus response thereto (Dkt. No. 53), TestAmerica's reply (Dkt. No. 55) and revised statement of undisputed material facts (Dkt. No. 56), Aerotek's reply (Dkt. No. 57), plaintiff's supplemental memorandum of law addressing additional depositions (Dkt. No. 64), and TestAmerica and Aerotek's replies to plaintiff's supplemental memorandum (Dkt. Nos. 67 and 68). For the reasons that follow, I will grant defendants' motions.

## BACKGROUND

Aerotek "is engaged in the business of supplying quality temporary staffing services on a

---

[1] TestAmerica contends that it is properly identified as TestAmerica Laboratories, Inc. Dkt. No. 47-2 at ECF p. 5.

[2] By Order of August 16, 2011, the Court granted Aerotek's motion to dismiss plaintiff's Title VII claims for race discrimination and retaliation against it. Dkt. No. 43.

contract basis to various clients." Dkt. No. 48-4 at ECF p. 6.[3] TestAmerica, an "analytical laboratory for environmental testing services," Dkt. No. 47-1 at ¶ 1, was a client of Aerotek. Dkt. No. 48-1 at ¶ 4. Plaintiff was Aerotek's employee, id. at ¶ 8, and was temporarily assigned to analyze environmental samples for the presence of polychlorinated biphenyls (PCBs) for TestAmerica at its King of Prussia, Pennsylvania location from October 2007 through August 2008. Id. at ¶¶ 17,

Plaintiff began working with Aerotek to find a job placement in October 2007. Id. at ¶ 8. Jeremiah Pinto, an Aerotek recruiter, contacted her about a position with TestAmerica. Id. at ¶ 9. Plaintiff then had a face to face meeting with Pinto where he explained Aerotek's role as a staffing company. Id. at ¶ 10. As plaintiff explained, she understood that Aerotek would act as a "negotiator" and as her "talking resume" and "basically help [her] as much as they can to find a position" with a company or employer. Id. at ¶ 11. After her meeting with Pinto, plaintiff requested that she be scheduled for a meeting with TestAmerica. Id. at ¶ 12. She then had an in-person interview for a PCB Analyst Lab Technician position with Marge Slater, TestAmerica's Organics and Inorganics Laboratory Manager. Id. at ¶ 13.

During plaintiff's interview with Slater, they discussed plaintiff's resume and her prior work experience as a GC analyst for Lionville Laboratories, Inc. and as a PCB analyst for Weidmann-ACTI, Inc.. Dkt. No. 56 at ¶ 6. Slater ultimately told plaintiff that she "was highly interested" in hiring her. Id. at ¶ 7. Slater advised Aerotek that she wanted plaintiff to work at

---

[3] The facts set forth in this section are derived from the facts set forth in Aerotek's Statement of Undisputed Material Facts (Dkt. No. 48-1) and TestAmerica's Revised Statement of Undisputed Material Facts (Dkt. No. 56). Plaintiff's briefs (Dkt. Nos. 53 and 64) do not include sections setting forth her version of the relevant facts and she did not file a separate statement of disputed material facts.

TestAmerica in a temporary capacity.  Id.  Pinto contacted plaintiff after her interview and formally offered her the PCB Analyst position at TestAmerica.  Id. at ¶ 16.

Plaintiff submitted a completed I-9 form, background check information and other pre-employment paperwork to Aerotek.  Id. at ¶ 22.  She was presented with an employment agreement pursuant to which Aerotek "offer[ed] to employ [plaintiff] in the capacity of Technician . . . at its client, Test America . . . for services with the latter for a temporary period."  Id. at ¶¶ 8-9.  Plaintiff executed the employment agreement on or around October 16, 2007.  Id. at ¶ 11.  Plaintiff testified that she understood that she would be an employee of Aerotek and not TestAmerica and that her assignment at TestAmerica was temporary in nature.  Id. at ¶¶ 11-12.  Plaintiff was to "look solely to AEROTEK for all employee benefits in connection with [her] employment under [the employment a]greement."  Id. at ¶ 10.  Aerotek would pay Trent for her services at TestAmerica based on timesheets approved by TestAmerica.  Dkt. No. 48-1 at ¶ 23.  Specifically, Aerotek paid plaintiff $19.00/hour for work performed at TestAmerica, less withholdings and deductions.  Dkt. No. 56 at ¶ 24.  Aerotek also provided medical benefits to plaintiff.  Dkt. No. 48-1 at ¶ 23.  Further, Aerotek, and not TestAmerica, provided plaintiff with workers' compensation coverage.  Dkt. No. 56 at ¶ 23.

Plaintiff began working at TestAmerica on October 29, 2007.  Dkt. No. 48-1 at ¶ 17.  Her job duties included analyzing soil and water samples and providing the results of her analysis to TestAmerica's clients.  Id. at ¶ 19.  TestAmerica determined her eight-hour shift work schedule.  Id. at ¶ 21.  TestAmerica employees trained her and assigned, directed, controlled and supervised her work.  Id. at ¶ 20.  Plaintiff reported to Slater.  Id. at ¶ 18.

Plaintiff was the only individual responsible for analyzing PCBs at TestAmerica during her assignment.  Dkt. No. 56 at ¶ 18.  At the time, however, three other analysts worked in the

Organics and Inorganics Department: Adrian Orsati, Brad (last name unknown) and Amanda Heyser. Id. at ¶ 18. Adrian and Brad were permanent TestAmerica employees during most, if not all of plaintiff's assignment. Id. at ¶ 19. Amanda began at TestAmerica as a temporary worker placed by a staffing agency other than Aerotek, but became a permanent TestAmerica employee by March 2008. Id. at ¶ 19.

On February 13, 2008, Slater emailed Shea to express her concern about plaintiff's hourly rate – "by far the most paid for anyone through a staffing agency." Dkt. No. 48-1 at ¶ 34. Slater expressed dismay because plaintiff did not have a college degree, a preferred qualification for TestAmerica laboratory analysts and because plaintiff lacked training that TestAmerica had expected she would have based on her past experiences. Id. at ¶ 35. Slater requested that Aerotek work out an arrangement to lower plaintiff's agreed-upon hourly rate. Id. at ¶ 34. Aerotek, however, did not agree to lower plaintiff's rate at any time during her placement at TestAmerica. Id. at ¶ 37.

At some point during her tenure at TestAmerica, plaintiff's relationship with Slater soured. Id. at ¶ 24. Plaintiff contends that her race was the reason for the change. Id. at ¶ 24. Plaintiff claims that on or around February 15, 2008, she asked Slater for help calibrating instruments and Slater told her "I don't have time for this" and that plaintiff should already know how to calibrate the instruments. Dkt. No. 56 at ¶ 31. Despite her complaints about Slater, plaintiff testified that she does not believe that Slater's comments were related to her race. Id. at ¶ 32. Further, plaintiff did not complain to anyone at TestAmerica about Slater's comments. Id. Nor did she ever complain to anyone at TestAmerica that she felt she was being discriminated against or treated differently because of her race. Id. at ¶ 82.

-4-

On or around April 10, 2008, a TestAmerica client took three Organics and Inorganics lab analysts, all of whom were permanent TestAmerica employees at the time, out for lunch. Id. at ¶¶ 33-34. Slater did not invite plaintiff to join them. Id. at ¶ 33. Plaintiff has not identified any other meals to which she was not invited. Id. at ¶ 38. Immediately prior to the lunch, Slater had spoken with plaintiff regarding her belief that plaintiff was not completing her work assignments promptly. Id. at ¶ 35. Plaintiff admits that she did not always complete her assignments in a timely manner, explaining that "[i]f something does take me longer than anyone else, it's because I simply don't know what I'm doing." Id. at ¶ 36.

Plaintiff further contends that on or around April 18, 2008, while Amanda was a permanent TestAmerica employee, Slater provided instrument maintenance training to Amanda but that Slater did not provide her with the same training. Id. at ¶ 46. Plaintiff concedes, however, that she received other training from TestAmerica during her assignment and further allows that she has no idea whether her race factored into the decision not to give her the same maintenance training as Amanda. Id. at ¶ 49. Further, when plaintiff asked Slater for training regarding TestAmerica's protocol for producing and putting out PCBs, Slater responded "no problem. Do you want to come in early like around 6 when I get here? And I'll go over whatever you feel as though you don't know." Id. at ¶ 50.

Plaintiff asserts, however, that after Slater had trained her, she concluded that Slater had not given her the correct information and "[s]o [she] questioned it. And that's when [Slater] started acting differently towards [her]." Id. at ¶ 50. She contends that Slater's "attitude changed because [plaintiff] questioned her." Id.

Plaintiff contends that Slater invited her to department meetings at the beginning of her assignment, but that as time progressed, she was not invited to three department meetings. Id. at

¶ 44. At her deposition plaintiff conceded that she has no idea whether race played any role in Slater's decision to not invite her to the meetings. Id. at ¶ 45.

Plaintiff also contends that she did not like the tone of voice Slater used when she was talking to her. Id. at ¶ 42. She admitted, however, that Slater's tone of voice could have been unrelated to her race and that she has no evidence that Slater used a particular tone of voice when speaking to her because of her race. Id. at ¶ 43. At her deposition, plaintiff admitted that Slater never made a racist comment specifically directed at her , that she never heard Slater make a racist comment generally and that no one ever told her that Slater made a racist comment. Id. at ¶ 41. Plaintiff only references a comment of "that's how we do it" or "that's how it is done" made by Slater to Brad, Adrian and/or Amanda. Id. at ¶ 39. Plaintiff testified that she has no understanding as to what Slater meant by this comment and that she had no idea whether the comment referred to African-Americans, Caucasians or, for that matter, any race. Id. at ¶ 40. Plaintiff admits that Slater's treatment of her was possibly because Slater was not a good manager and not because she is a racist. Id. at ¶ 59.

At some point during the early spring of 2008, plaintiff contacted Aerotek Account Manager Joel Shea to complain about Ms. Slater. Dkt. No. 48-1 at ¶ 25. Plaintiff claims that she informed Shea that Slater treated her differently from her coworkers and speculated that Slater's treatment of her "might be race related." Id. at ¶ 26 (emphasis omitted). Shea told plaintiff that he would work on finding her another assignment outside of TestAmerica. Id. at ¶ 30. Plaintiff testified that after her discussion with Shea, she was told that Shea and Pinto began looking for an alternate placement for her. Id. at ¶ 32.

On or around May 21, 2008, Slater told plaintiff she would be required to complete a PE sample – an annual performance sample required for TestAmerica's continuing certification as a

certified lab. Dkt. No. 56 at ¶ 53. Plaintiff ran two PE samples – one failed and one passed. Id. at ¶ 56. When Slater learned that a sample had failed on or around May 30, 2008, she advised plaintiff that if TestAmerica lost its certification, plaintiff would be "out the door." Id. at ¶ 57. Plaintiff continued working at TestAmerica for three months after the failed sample. Id. at ¶ 58.

On or around June 6, 2008, plaintiff filed a charge of discrimination with the EEOC alleging race discrimination against TestAmerica (and not against Aerotek). Id. at ¶ 83. TestAmerica contends that it did not receive notice of plaintiff's charge until almost a year later on August 19, 2009, well after plaintiff ceased working at TestAmerica. Id. at ¶ 84.

In the summer of 2008, suffering from declining sales, TestAmerica decided to discontinue using staffing agencies to fill its temporary and permanent hiring needs due to the costs associated with their use. Id. at ¶¶ 61-62. Accordingly, in or around August 2008, Slater and TestAmerica's lab director advised Shea that TestAmerica had decided to discontinue using Aerotek's services and that plaintiff's temporary assignment with TestAmerica would conclude at the end of August. Id. at ¶ 63. Aerotek advised plaintiff that her assignment with TestAmerica would end on August 27, 2008. Id. at ¶ 67.

Slater and TestAmerica's lab director told Shea that TestAmerica was interested in hiring plaintiff as a permanent employee. Id. at ¶ 64. Shea informed them that Aerotek would allow TestAmerica to convert plaintiff to a permanent employee only if TestAmerica agreed to pay Aerotek's fees for an additional three months. Id. at ¶ 66. TestAmerica was unsuccessful in negotiating Aerotek's fees and discontinued its relationship with plaintiff at the end of August. Id. at ¶ 66.

Since August 2008, TestAmerica has not hired any further employees at its King of Prussia location through Aerotek or other staffing agencies. Id. at ¶¶ 71-72. To replace plaintiff,

TestAmerica placed an employment advertisement and directly hired Danielle Selena as a PCB analyst. Id. at ¶ 68-69. Plaintiff conceded that TestAmerica saved money by hiring Selena, instead of continuing a relationship with plaintiff. Id. at ¶ 73.

After plaintiff left TestAmerica, Pinto contacted her about a temporary chemist position at the Lionville Laboratory in Exton, Pennsylvania. Dkt. No. 48-1 at ¶ 38. Plaintiff told Pinto that due to the length of the commute, she would only consider the position if he could negotiate a higher hourly wage for her. Id. at ECF p. 6 n.4. Plaintiff testified that she remained in regular contact with Pinto throughout October and November 2008. Id. at ¶ 39. Pinto left Aerotek in November 2008 without transitioning plaintiff to another recruiter. Id. at ¶ 40. In fact, Aerotek did not reassign any of Pinto's job candidates to other recruiters after his departure. Id. at ¶ 42.

In March 2009 Aerotek recruiter Danielle Ciambotti spoke with plaintiff about the types of positions that would interest her and updated her profile. Id. at ¶ 44. Although Aerotek did not have any possible positions for plaintiff at the time, Ciambotti spoke with plaintiff on multiple occasions that month. Id. at ¶ 45. Plaintiff testified that she did not doubt that Ciambotti was working to find her a position and further, that she did not believe that Ciambotti "blackball[ed] her in the industry." Id. at ¶ 46. Aerotek also continued to email plaintiff about job opportunities with its clients. Id. at ¶ 49. In March 2009, plaintiff declined to submit her resume for a position in central New Jersey identified in an email from an Aerotek recruiter. Id. at ¶ 50. In May and August 2011, Aerotek recruiters called plaintiff about available positions. Id. at ¶¶ 52, 55. Plaintiff did not express an interest in the openings and ultimately informed an Aerotek recruiter that she was pregnant and no longer looking for job opportunities, although she would follow up with Aerotek at the end of 2011. Id. at ¶¶ 55-58. Aerotek has not contacted or heard from plaintiff since August 2011. Id. at ¶¶ 59-60.

## STANDARD OF REVIEW

The party moving for summary judgment has the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under governing law. Id. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## DISCUSSION

I.      **Discrimination Claims**

Under the framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff asserting claims of discrimination under Title VII, the PHRA, and/or Section 1981 must first establish her prima facie case. See Burton v. Teleflex, Inc., 707 F.3d 417, 425-26 (3d Cir. 2013) (Title VII); Jones v. Sch. Dist. Of Phila., 198 F.3d 403, 409 (3d Cir. 1999) (holding that state law claims for race discrimination pursuant to the PHRA are analyzed under the same framework as claims brought under Title VII); Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009). ("[T]he elements of a § 1981 claim are identical to the elements of a Title VII employment discrimination claim." ). In the absence of direct evidence of discrimination, plaintiff may establish her prima facie case by alleging:  1) that she is a member of a protected class; 2) she was qualified for the position she held; 3) she suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances that give rise to an inference of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). To withstand defendants' motions for summary judgment, plaintiff must "establish some causal nexus between [her] membership in a protected class" and the alleged adverse employment action. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 799 (3d Cir. 2003). Her "subjective belief that race played a role in an employment decision is not, alone, sufficient to establish an inference of discrimination." Wilson v. Blockbuster, Inc., 571 F. Supp. 2d 641, 647 (E.D. Pa. 2008), citing Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000).

Defendants argue that plaintiff has not made out a prima facie case for discrimination based on her race against either of them. Plaintiff counters defendants' contentions by arguing that a "blatant inconsistency" with respect to the reason for her dismissal in the testimony provided by employees of Aerotek and TestAmerica creates "a reasonable inference that one or both of the Defendants acted for a discriminatory reason." Dkt. No. 64 at ECF p. 9. She asserts that "Aerotek claims Test America did not want Plaintiff because she had 'performance problems' that do not exist." Dkt. No. 64 at ECF p. 9 (emphasis omitted). She also cites testimony from a TestAmerica employee "that no 'performance problem' prevented Plaintiff from being hired and that the reason she was not was allegedly an excessive fee demanded by Aerotek."[4] Contrary to plaintiff's contention, I find that this inconsistency standing alone is insufficient to create a reasonable inference of discrimination. Further, as is set forth below, plaintiff has not set forth any other evidence that is sufficient to meet her burden to establish the fourth prong of her prima facie case with respect to either defendant.

### A. Title VII, Section 1981 and PHRA Discrimination Claims Against TestAmerica[5]

---

[4] Based on this inconsistency, plaintiff contends that her case should go forward under the mixed motive framework set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). See Dkt. No. 64 at ECF p. 4. To succeed under a mixed-motive theory, plaintiff must present "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor" in defendants' decisions to discontinue their relationship with plaintiff. Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003); see also Cange v. Phila. Parking Auth., 451 F. App'x 210, 213 (3d Cir. 2011) ("even under the mixed-motive theory, a plaintiff must produce some evidence of discrimination"). I find that plaintiff's discrimination claims are not saved by the mixed motive analysis because, as is further set forth below, she has not provided any evidence of the requisite discriminatory animus.

[5] TestAmerica argues that plaintiff's claims against it must fail because it was not her employer. To determine whether TestAmerica was plaintiff's employer for purposes of her claims against it, I would be required to consider not only whether she was technically an employee of TestAmerica, but also whether it exercised "significant control" over plaintiff through a consideration of factors including TestAmerica's supervision of plaintiff, its ability to discipline her and its authority to hire and fire her and set conditions of her employment, including her compensation, benefits and hours. See McKenna v. Healthease, Inc., No. 10-3940,

-11-

Plaintiff has not made a sufficient showing on summary judgment to support a finding that her treatment by TestAmerica was motivated by discrimination. Plaintiff testified that she never heard Slater make a racist comment, Dkt. No. 48-3 at 119:20-120:1, and that "nobody ever told [her] that [Slater] made a racist comment towards [her] . . . " Id. at 120:4-5. Absent direct evidence of Slater's alleged racism, plaintiff supports her discrimination claims with her testimony that she perceived racism in Slater's "actions, just the way she – just the way she talked towards me. It was just like why do you talk to me in this tone but everyone else you talk to in a different manner no matter what the situation is." Dkt. No. 48-3 at 130:5-9. Plaintiff conceded, however, that it was possible that Slater's treatment of her could be unrelated to her race. Id. at 203:14-16; see also id. at 209:24-210:7 ("I can't say it was because of my race, but I can say it was a possibility it had something to do with it, just like it's a possibility of anything.").

In her amended complaint, plaintiff complained that when she asked Slater for help with calibrating her instruments, Slater responded by saying that plaintiff should already know how to calibrate the instruments and remarked that "I don't have time for this." Dkt. No. 16 at ¶ 25. At her deposition, however, plaintiff conceded that she did not believe that Slater's comments were based on her race. Dkt. No. 47-8 at 111:22-112:1. Plaintiff testified as to her belief that she was

---

2013 WL 1702639, at *7 (E.D. Pa. Apr. 18, 2013); see also Shah v. Bank of Am., 598 F. Supp. 2d 596, 602 (3d Cir. 2009) ("the court does not determine whether plaintiff is technically an employee of defendant, but instead must discern the level of control an organization asserts over an individual's access to employment and the organization's power to deny such access) (citations and internal quotation omitted); Moss v. Steele Rubber Prods. Inc., No. 5:07cv76, 2010 WL 1380364, at *3-4 (W.D.N.C. March 29, 2010) ("the degree of control exercised by the employer over the employee is the 'touchstone inquiry'").

    I decline to answer the question of whether TestAmerica was plaintiff's employer because I find that plaintiff has not set forth sufficient evidence of discrimination or retaliation to support her claims of discrimination and retaliation against it even if it were to qualify as her employer.

not invited to the client lunch because she "just d[id]n't think [Slater] wanted the black face to represent the work that was being done." Dkt. No. 48-3 at 117:2-8. However, when asked whether she had any evidence to support her conclusion, plaintiff explained only that she had overheard Slater say things like "that's how it's done, that's how we do it" and although she inferred that such comments were racist, she agreed that she had no idea whether the comments were intended as racist remarks. Id. at 118:9-119:19. Plaintiff's allegations do not establish the causal nexus required to establish her claim of discrimination against TestAmerica. See Williams McCoy v. Starz Encore Grp., No. 02-5125, 2004 WL 356198, at *7-8 (E.D. Pa. Feb. 5, 2004) (finding the plaintiff had not established her prima facie case of discrimination where "she perceived the unfriendly treatment to have been racially motivated" but "introduced no evidence other than her unsupported personal beliefs").

Further, plaintiff has not set forth evidence to suggest that similarly situated non-members of her protected class, e.g., temporary laboratory analysts who are not African American, were treated more favorably than she was. See Morris v. G.E. Financial Assurance Holdings, No. 00–3849, 2001 WL 1558039, at *5 (E.D. Pa. 2001) (citation omitted) ("Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside of the relevant class."). To be similarly situated, an employee must have been "subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Wynn-Mason v. Levas Commc'ns, LLC, No. 09-1235, 2011 WL 1599238, at *7 (E.D. Pa. Apr. 28, 2011). With respect to plaintiff's claim that she did not receive the same training as Amanda, Amanda began her tenure at TestAmerica as a

temporary employee employed by a staffing agency other than Aerotek, but she was a permanent TestAmerica employee and not similarly situated with plaintiff when she received training that was not offered to plaintiff.[6] Dkt. No. 48-3 at 141:15-144:20. Also, after TestAmerica discontinued its relationship with plaintiff, it discontinued hiring through staffing agencies for positions at its King of Prussia location, thus the individual hired to fill plaintiff's position was not similarly situated with plaintiff. C.f. Nelson v. DeVry, Inc., No. 07-4436, 2009 WL 1213640, at *7 (E.D. Pa. Apr. 23, 2009) (finding plaintiffs did not establish the requisite causal connection to establish their prima facie case of discrimination where they "adduced no evidence to suggest that [defendant] continued to seek out individuals with similar qualifications after terminating (and refusing to rehire) the Plaintiffs under circumstances that raise an inference of unlawful discrimination").

"That Plaintiff feels she was treated poorly is insufficient to establish the presence of the discriminatory animus required for liability" to attach. Sencherey v. Stout Rd. Assocs., Inc., No. 09-2856, 2011 WL 499981, at *8 (E.D. Pa. Feb. 11, 2011). I will grant TestAmerica's motion for summary judgment with respect to plaintiff's discrimination claims against it.

### B. Section 1981 and PHRA Discrimination Claims Against Aerotek

Likewise, I find that plaintiff has not establish the fourth prong of her prima facie case against Aerotek because she has not set forth any evidence that would suggest that her race caused Aerotek to stop searching for temporary job placements on her behalf or to ultimately discontinue its relationship with her. Indeed, the evidence before me shows that Aerotek continued to supply plaintiff with information about job openings after she ceased to work at

---

[6] I note also that plaintiff's own testimony that Slater offered to train her if she came in to work early, Dkt. No. 56 at ¶ 50, raises a question as to whether Slater in fact did not provide plaintiff with the same training that was provided to Amanda.

TestAmerica.  Also, plaintiff testified that she did not believe that Aerotek's recruiters were treating her badly, blackballing her or not looking for open positions for her.  Dkt. No. 48-3 at 279:17-280:4.  Instead, plaintiff testified that she believed Aerotek's recruiters "were doing the bare minimum to cover themselves."  Id. at 281:18-19.  Without more, this is not evidence sufficient to create a reasonable inference of discrimination.  And plaintiff has not provided the Court with any further evidence of discrimination.  She has not identified any derogatory or disparaging comments made to her by any employees of Aerotek.  Nor has plaintiff identified a single non-African American individual in a comparable situation who Aerotek treated more favorably than plaintiff.  Tellingly, when asked whether she had documented any concerns related to Aerotek in a journal that she kept at the direction of the EEOC, plaintiff responded, "[n]o. . . . I only had a problem with Marge [Slater]."  Id. at 293:13-18.

Given the paucity of evidence set forth by plaintiff, I conclude that she has not met her burden to establish a prima facie case of discrimination as against Aerotek and I will grant its motion for summary judgment with respect to plaintiff's discrimination claim against it.  See King v. School Dist. of Phila., No. 00-2503, 2001 WL 856948, at *4 (E.D. Pa. 2001) ("Plaintiff's conclusory and unsupported beliefs are insufficient to create a genuine issue of material fact as to Defendants' motivation or support an inference of discrimination.").

## II.   Retaliation Claim Against TestAmerica

Plaintiff contends that TestAmerica terminated its relationship with her on August 27, 2008 in retaliation for her June 2008 EEOC filing.  In order to establish her prima facie case of retaliation against TestAmerica, plaintiff must show that there is a causal link between her EEOC complaint and her termination.  See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996) (citations omitted).  Further, to prove the requisite causal connection, plaintiff

must be able to show that TestAmerica had knowledge of her protected conduct when it decided to discontinue its relationship with her. See Iyer v. Everson, 382 F. Supp. 2d 749, 758 (E.D. Pa. 2005) aff'd, 238 F. App'x 834 (3d Cir. 2007) (finding the plaintiff failed to establish a prima facie case of retaliation where the plaintiff did not present any evidence to show that the defendant was actually aware of his EEO complaints).

TestAmerica contends that plaintiff cannot establish the requisite causal link because it did not receive a copy or other notice of plaintiff's EEOC charge until August 19, 2009, well after it ended its relationship with her. Dkt. No. 56 at ¶ 84. Plaintiff has not set forth any evidence to rebut TestAmerica's contention that it did not have notice of her EEOC filing at the time of her termination. Nor has she shown that a causal link is established by close temporal proximity between the filing of her EEOC complaint and TestAmerica's decision to end its relationship with her. Compare Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding that the plaintiff established causation for purposes of his prima facie retaliation case by showing that his discharge occurred only two days after his employer received notice of his EEOC claim). Standing alone, plaintiff's speculation that TestAmerica retaliated against her because she has "not been able to find a job since 2008 in that field," Dkt. No. 56-5 at 184:8-11, is not sufficient to establish the causal connection required to support her claim for retaliation. . Accordingly, I will grant TestAmerica's motion for summary judgment with respect to plaintiff's retaliation claim.

An appropriate Order follows.